UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. **25-CR-60048-WPD**

**UNITED STATES OF AMERICA**

vs.

**RAMON MANRIQUEZ CASTILLO, et al,**

      **Defendant.**
_____/

### GOVERNMENT'S RESPONSE IN OPPOSITION TO DEFENDANT, FERNANDO JAVIER ESCOBAR TITO'S, MOTION TO DISMISS INDICTMENT FOR LACK OF JURISDICTION

      The United States of America respectfully requests this Honorable Court deny defendant's Motion to Dismiss as it is both factually and leally infirm. The indictment in this case properly alleged the statutory elements and jurisdictional requirements of the charged offenses, including the use of United States registered aircraft.

### INTRODUCTION

      On February 27, 2025, a federal grand jury returned a two-count indictment against co-defendants, Ramon Manriquez Castillo, Edgar Rodriguez Ruano, Fernando Javier Escobar Tito, Anderson Jair Gamboa Nieto, Marlos Alberto De Paula Balcacar, and Marlon Edwards, charging them with one count of Conspiracy to Distribute a Controlled Substance in violation of Title 21, United States Code, Sections 959(c)(1) and 963, and one count of Distribution of a Controlled Substance in violation of Title 21, United States Code, Section 959(c)(1), and Title 18, United States Code, Section 2. [DE 3].

1

## STATEMENT OF FACTS

Since November 2023, DEA confidential source 1 (CS-1) was in communication with members of a transnational drug trafficking organization (DTO) regarding using aircraft to transport loads of cocaine. On November 15, 2023, CS-1 traveled to Curacao to meet with DTO pilots who were in control of and operating United States registered aircraft N337LR. United States registered aircrafts' tail numbers always begin with the letter "N."

CS-1 confirmed that he/she met with two pilots, one of them being codefendant Castillo. During the meeting, Castillo and the other pilot discussed utilizing the aircraft to pick up a load of 1,500 kilograms of cocaine in Colombia, then flying it disguised as a humanitarian flight. Castillo told CS-1 that they would fly to St. Vincent and then on to the Grenadines, where they would acquire false passports.

On December 12, 2023, Castillo and other DTO pilots flew aircraft N337LR from Curacao to Suriname, Africa and landed at the Johan Adolf Pengel International Airport. The purpose was to stage and prepare the plane for a flight to transport cocaine. On December 21, 2023, aircraft N337LR and the three pilots flew to St. Vincent. On December 22, 2023, the aircraft and crew, including Castillo, departed with a request to land in Suriname again; however, the aircraft proceeded to Venezuela where it retrieved a load of approximately 2,500 kilograms of cocaine to fly to Africa. On December 23, 2023, Castillo, the other DTO pilots, and aircraft N337LR landed in Guinea-Bissau, Africa, where other co-conspirators facilitated the offloading and safe storage of the cocaine.

In August 2024, three DTO members were planning to move a Gulfstream IV or similar aircraft from Venezuela to Africa with 2,000 to 3,000 kilograms of cocaine. On August 20, 2024,

CS-1 was on a call with two of the DTO members in which they expressed their willingness to pay $150,000.00 U.S.C. for "blacking out" (hiding the flight and tracking from authorities) a flight to Venezuela and on to Africa. The DTO members requested assistance in finding a location in the Caribbean that could facilitate the "black flight."

On an August 21, 2024 recorded call, CS-1 spoke with codefendant Edwards and another member of the DTO. Based on other conversations with members of the DTO, CS-1 explained that the organizers of the flight from Mexico needed to fly a "white" flight (a normal legally-filed flight) to the Bahamas, then have a "black" flight (disguised flight without a filed flight plan) out of the Bahamas. The DTO members told CS-1 that this request could be facilitated and that they would send CS-1 the details of the FBO that could accomplish this movement.[1]

Over the next several days, starting on August 22, 2024, codefendant Edwards and other DTO members had multiple WhatsApp conversations with CS-1 regarding coordinating for the aircraft, flight, pilots, and payment.  Edwards and other DTO members had contacts in the Bahamas to assist with staging the aircraft for flight, providing accommodations for the pilots, and "blacking out the flight" from the Bahamas to Venezuela. Through multiple conversations between CS-1 and members of the DTO, it was determined that the DTO's plan was to legitimately fly an aircraft with vacationers from Mexico to the Bahamas, then utilize that aircraft for a blacked-out flight to Venezuela to pick up a load of cocaine, transport the cocaine to Africa, and then return to the Bahamas.

Through conversations between CS-1 and members of the DTO, it was originally determined that payment to Edwards and other members totaling $100,000.00 USC would be

---

[1] FBO is a "fixed based operator" where aircrafts are staged, fueled, and prepared for flight.

transferred via a crypto wallet to Miami, Florida and paid out in cash. The DTO provided CS-1 the name "Shawnee" as the person who would receive payment in Florida, and whose cellular number was 786-782-6276. CS-1 and Edwards had multiple conversations, and Edwards knew that CS-1 was located in Florida. CS-1 was told Shawnee would pick up an initial $25,000.00 USC as payment for DTO members' flight and accommodations in the Bahamas, as well as for blacking-out the flight from Exuma, Bahamas to Venezuela. A member of the DTO also provided CS-1 with a crypto-currency wallet to assist in transferring payment from the financiers of the cocaine to the DTO members in the Bahamas. Ultimately, the DTO member's original plan to pay cash to Shawnee as an intermediary in Florida would take too long, so payment was made to the DTO members in the Bahamas through the crypto wallet. The DTO chose to use USDT as its cryptocurrency.[2]

On August 29, 2024, a DTO member provided CS-1 with aircraft tail number N68AR that would be utilized to fly the DTO pilots and crew to Exuma, Bahamas, who would then pilot aircraft XA-SBT from the Bahamas to Venezuela to pick up the cocaine, and then to Africa to deliver the cocaine. Unlike "N-tailed" aircraft that are registered in the United States, "X-tailed" aircraft are registered in Mexico.

Originally, the DTO conspired to use United States registered aircraft N144AB to fly a legally-filed flight with legitimate vacationers from New York to the Bahamas, and then have their DTO pilots fly aircraft N144AB to Venezuela to receive the cocaine and then fly on to Africa to deliver the cocaine. A lease for aircraft N144AB was prepared, and the DTO made at least two

---

2  USDT is a cryptocurrency that is pegged to the U.S. dollar, so the value of one USDT is intended to be equal to one U.S. dollar, meaning it's backed by a corresponding amount of U.S. dollars held in reserve by Tether.

down payments using USDT cryptocurrency in the amounts $50,000.00 and $30, 900.00 on May 30, 2024. The DTO also requested CS-1 to travel to Opa Locka, Florida to inspect aircraft N144AB. CS-1 observed aircraft N144AB in Opa Locka on May 14th and May 15th, 2024. CS-1 took a video of aircraft N144AB at the Opa Locka airport and sent the video to CS-2. CS-2 then forwarded the video to the DTO in Mexico. After vetting the resume and flight history of CS-1, the DTO hired CS-1 to fly to Chino, California where CS-1 would meet and pilot aircraft N144AB as part of the smuggling venture. On or about June 10, 2024, CS-1 flew to Los Angeles, California enroute to Chino, California where aircraft N144AB would then be located. Ultimately, on June 13, 2024, the owners of aircraft N144AB decided against allowing the use of the aircraft, and the DTO found aircraft XA-SBT to replace it.[3]

On August 28, 2024, the DTO flew aircraft XA-SBT from Mexico to Exuma, Bahamas with legitimate vacationers and one DTO member who would assist in staging the aircraft in the Bahamas for its flight to Venezuela. On the flight to the Bahamas, aircraft XA-SBT requested and received permission to travel through U.S. airspace. On August 30, the DTO flew aircraft N68AR from Mexico to Exuma, Bahamas with other members of the DTO to also assist in staging aircraft XA-SBT for the flight to Venezuela and eventually to Africa.

On September 6, 2024, codefendant Castillo and the other codefendant pilots, including Escobar Tito, flew aircraft XA-SBT from Exuma, Bahamas to a clandestine airstrip in Apure, Venezuela. When aircraft XA-SBT arrived, United States registered DTO aircraft N2HC was being staged with a load of cocaine on the same airstrip. Aircraft XA-SBT was loaded with cocaine by the same individuals who loaded aircraft N2HC. The airstrip for both aircrafts was paid for by

---

[3] Castillo had flown to Exuma, Bahamas and waited approximately 10 days for aircraft N144AB to arrive.

the same DTO member, known as "La Flaca."

On September 7, 2024, CS-1 confirmed that aircraft XA-SBT left from Apure, Venezuela and was headed to Mali, Africa with approximately 2,500 kilograms of cocaine. The Colombian Air Force tracked both aircraft a few hours apart leaving the same clandestine airstrip in Apure, Venezuela and heading towards Africa. The first aircraft, N2HC, landed successfully in Mali; however, due to military concerns in Mali, as well as a fuel emergency, aircraft XA-SBT was diverted to Guinea-Bissau, Africa. Before aircraft XA-SBT was diverted to Guinea-Bissau, the cocaine loads from both aircraft XA-SBT and aircraft N2HC were going to be received by the same individual known as "El Principe." After being alerted by the Drug Enforcement Administration (DEA), the Guinea-Bissau Judicial Police successfully detained the aircraft, seized approximately 2.6 metric tons of cocaine, and arrested the codefendant pilots and crew, including Castillo and Escobar Tito.



DEA agents received eighteen (18) kilograms of the cocaine load as a representative sample and sent them to the DEA Lab for testing. The results were 89% pure cocaine. Eighteen kilograms were taken as a sample because the various seized packages had eighteen different head-stamps (logos stamped on the packages). Eight of the eighteen head-stamps have previously been seized in the United States or in United States territory.

Shortly after the seizure, the DTO provided CS-1 with tail number N765RM for another aircraft that they were attempting to purchase to make another flight to Africa to recoup the loss from the flight on aircraft XA-SBT.

## LEGAL STANDARD

Under Federal Rule of Criminal Procedure 12(b)(1), a defendant may raise any defense, objection, or request by pretrial motion that the court can determine without a trial. An indictment survives a motion to dismiss if it (1) presents the essential elements of the charged offense, (2) notifies the accused of the charges, and (3) allows the accused to use a judgment as a bar against double jeopardy. *United States v. Steele*, 178 F.3d 1230, 1233-34 (11th Cir. 1999). Under Federal Rule of Criminal Procedure 12(b)(2), a motion that the Court lacks jurisdiction may be made at any time while the case is pending. An indictment that tracks the statutory language of an offense is generally sufficient. *See Hamling v. United States*, 418 U.S. 87, 117 (1974). Here, Counts 1 and 2 notify the Defendant, Escobar Tito, of the charges and allege all essential elements by tracking the language of the applicable statutes.

A defendant also may seek to dismiss an indictment on the grounds that it "affirmatively allege[s] facts that conclusively negate[] the existence of any offense against the laws of the United States." *United States v. Brown*, 752 F.3d 1344, 1353 (11th Cir. 2014). These types of challenges

are quite narrow; they require determining if the indictment's allegations charge "a crime that simply did not exist in the United States Code" or "conduct that undoubtedly fell outside the sweep of the [charging] statute." *Id*.

In resolving Rule 12 motions, the Eleventh Circuit has cautioned that "[t]here is no summary judgment procedure in criminal cases." *United States v. Salman*, 378 F.3d 1266, 1268 (11th Cir. 2004). Therefore, a pre-trial review of an indictment must not reach beyond the four corners of the indictment. *United States v. Joyner*, 2009 WL 1286211, at *2 (N.D. Fla. May 6, 2009) ("As long as the language in the four-corners of the indictment sets forth the essential elements of a crime, the indictment will stand."); *Salman*, 378 F.3d at 1268 ("A motion for acquittal under Rule 29 is the proper avenue for contesting the sufficiency of the evidence in criminal cases.").

## ARGUMENT

The indictment here sufficiently alleged the statutory elements and jurisdictional requirements for this prosecution to proceed.

The Defendant, Escobar Tito, was indicted in a two-Count Indictment as follows:

Count 1-Conspiracy to Distribute a Controlled Substance (21 U.S.C. §963)

From at least as early as in or around November 2023, and continuing through in or around September 2024, in the countries of Colombia, Venezuela, Mexico, the Bahamas, Guinea Bissau, and elsewhere, the defendants
[names omitted]
did knowingly and willfully combine, conspire, confederate, and agree with each other and with other persons known and unknown to the Grand Jury, (1) to distribute a controlled substance on board an aircraft registered in the United States, and (2) with a United States citizen on board any aircraft to distribute a controlled substance, in violation of Title 21, United States Code, Section 959(c)(1); all in violation of Title 21, United States Code, Section 963.

<u>Count 2-Distribution of a Controlled Substance (21 U.S.C. §959(c)(1))</u>

In or around September 2024, in the countries of Colombia, Venezuela, Mexico, the Bahamas, Guinea-Bissau, and elsewhere, the defendants
[names omitted]
with any United States citizen on board any aircraft, did knowingly distribute a controlled substance, in violation of Title 21, United States Code, Section §959(c)(1), and Title 18, United States Code, Section 2.

Counts 1 and 2 are predicated upon Title 21, U.S.C. § 959(c)(1) and Title 21, U.S.C. § 963, which state as follows:

<u>21 U.S.C. § 959(c)(1) Possession, Manufacture, or Distribution of a Controlled Substance by a Person Onboard an Aircraft</u>

It shall be unlawful for any United States citizen on board any aircraft, or any person on board an aircraft owned by a United States citizen or registered in the United States to:
(1) manufacture or distribute a controlled substance or listed chemical.

<u>21 U.S.C. § 963 Attempt and conspiracy</u>

Any person who attempts or conspires to commit any offense defined in this subchapter shall be subject to the same penalties as those prescribed for the offense, the commission of which was the object of the attempt or conspiracy.

Extraterritorial jurisdiction applies to all sections of Title 21, U.S.C. § 959, including § 959(c)(1), and by extension to conspiracy to commit a violation of § 959(c)(1). In fact, Title 21, U.S.C. § 959(d) specifically provides for acts committed outside the territorial jurisdiction of the United States: "This section is intended to reach acts of manufacture or distribution committed outside the territorial jurisdiction of the United States." There can be no argument to the contrary,

and defendant Escobar Tito makes no such claim in his motion.

## EXTRATERRITORIAL JURISDICTION APPLIES TO ANY PERSON WHO CONSPIRED TO DISTRIBUTE A CONTROLLED SUBSTANCE ON BOARD AN AIRCRAFT REGISTERED IN THE UNITED STATES

Escobar Tito first posits that he is not subject to extraterritorial jurisdiction because he was not arrested on an aircraft owned by a United States citizen or registered in the United States.[4] However, Escobar Tito fails to address the charge in Count 1 alleging that *during a certain time period* he conspired to distribute a controlled substance on board an aircraft registered in the United States, identifiable to all by its N-tail number.

Count 1 of the Indictment alleges the conspiratorial conduct occurred "from at least as early as in or around November 2023 and continued through in or around September 2024." Just a few months prior to Escobar Tito's arrest and seizure of the subject cocaine on board aircraft XA-SBT, the same DTO planned and took substantial steps to use an aircraft registered in the United States. Originally, the DTO conspired to transport the same load of cocaine using United States registered aircraft N144AB. The DTO organizers planned to fly aircraft N144AB to New York to pick up legitimate passengers as cover and then fly to the Bahamas. The DTO pilots would then fly aircraft N144AB to Venezuela to receive the cocaine, and then onto Africa to deliver the cocaine.

A lease for aircraft N144AB was prepared, and the DTO made at least two down payments using USDT cryptocurrency in the amounts $50,000.00 and $30,900.00 on May 30, 2024. The DTO also requested CS-1 to travel to Opa Locka, Florida to inspect aircraft N144AB. CS-1 observed aircraft N144AB in Opa Locka on May 14th and May 15th, 2024. CS-1 took a video of aircraft N144AB at the Opa Locka airport and sent the video to CS-2. CS-2 then forwarded the

---

4 The Government concedes the aircraft was not owned by a United States citizen.

11

video to the DTO in Mexico. The DTO hired CS-1 to fly to Chino, California where CS-1 would meet and pilot aircraft N144AB as part of the smuggling venture. On or about June 10, 2024, CS-1 flew to Los Angeles, California enroute to Chino, California where aircraft N144AB would then be located. Ultimately, on June 13, 2024, the owners of aircraft N144AB decided against allowing the use of the aircraft, and the DTO found aircraft XA-SBT to replace it.

Although Escobar Tito was ultimately arrested on aircraft XA-SBT, the same DTO organizers and financiers were involved in attempting to secure aircraft N144AB, and in securing aircraft XA-SBT. Both planned flights involved the same size load of cocaine, from the same clandestine airstrip in Apure, Venezuela, to the same trans-shipping point in Mali, Africa. Prior to aircraft N144AB being cancelled, codefendant Castillo had been waiting its arrival in the Bahamas for approximately 10 days.

The fact that the DTO's original plan to use aircraft N144AB to smuggle the load of cocaine ultimately proved unsuccessful does not change the legal equation of the conspirators' culpability. As promulgated in the Eleventh Circuit Pattern Jury Instructions, Instruction 0100, "Controlled Substances Conspiracy" (21 U.S.C. § 963), "The Government does not have to prove that all of the people named in the indictment were members of the plan, or that those who were members made any kind of formal agreement. The heart of a conspiracy is the making of the unlawful plan itself, so the Government does not have to prove that the conspirators succeeded in carrying out the plan.

Count 1 of the Indictment sufficiently tracks the statutory language of Title 21, U.S.C. § 963 Conspiracy to violate Title 21, U.S.C. § 959(c)(1), and puts Escobar Tito on notice of the charge against him. *See Hamling v. United States*, 418 U.S. 87, 117 (1974). Whether the

Government can prove the charge should be left to the fact-finder.

## EXTRATERITORIAL JURISDICTION APPLIES TO ANY PERSON WHO CONSPIRED WITH A UNITED STATES CITIZEN ON BOARD ANY AIRCRAFT TO DISTRIBUTE A CONTROLLED SUBSTANCE

Escobar Tito next posits that he is not subject to extraterritorial jurisdiction because he is not a United States citizen, unlike his codefendant and coconspirator Castillo, who is a United States citizen. However, Escobar Tito again fails to address the charge in Count 1 that alleges he *conspired* with a United States citizen (i.e., Castillo) on board any aircraft to distribute a controlled a controlled substance.

Pursuant to Title 21, U.S.C. §§ 959(c)(1) and 959(d), there is undoubtedly extraterritorial jurisdiction based on codefendant Castillo's status as a United States citizen, and Escobar Tito does not suggest otherwise. Escobar Tito argues that extraterritorial jurisdiction should apply to Castillo and not to any other non-United States citizen codefendant. However, the Government submits that Escobar Tito is not only a codefendant, but also a coconspirator as alleged in the Title 21, U.S.C. § 963 charge.

Escobar Tito relies on *United States v. Iguaran,* 821 F.3d 1335 (11th Cir. 2016), a case involving the preliminary showing necessary under the Maritime Drug Law Enforcement Act's ("MDLEA") provisions requiring that its proscribed offense be committed "on board a vessel subject to the jurisdiction of the United States." [DE 77, p.8] That an MDLEA offense be committed "on board a vessel subject to the jurisdiction of the United States" is only one way for that statute to confer jurisdiction over the proscribed extra-territorial offense. Similar to 21 U.S.C. § 959(c), however, the MDLEA also applies to drug trafficking on "a vessel of the United States" or "any other vessel if the individual [possessing the drugs on board] is a citizen of the United

13

States." 46 U.S.C. § 70503(e). *Iguaran* does not address the sufficiency of what jurisdictional elements must be alleged in an indictment, but what sort of evidentiary showing the government must make to satisfy the pretrial procedure for determining the non-element subject matter jurisdictional provisions of the MDLEA. *See* 46 U.S.C. § 70504(a). Here, the indictment plainly alleges a conspiracy to possess with intent to distribute cocaine on an aircraft with a United States citizen on board. *See* 18 U.S.C. § 959(c).

Escobar Tito was apprehended on Aircraft XA-SBT with United States citizen Castillo on board.[5] Escobar Tito did not have to be aware that codefendant Castillo was a United States citizen, which provided the extraterritorial jurisdiction. Similar arguments have been made by defendants on board a "N-tailed" plane (registered in the United States).

In *United States v. Epskamp,* 832 F.3d 154 (2d Cir. 2016), Epskamp appealed his conviction for conspiracy to possess with intent to distribute a controlled substance on board an aircraft registered in the United States, and possessing with intent to distribute a controlled substance on board an aircraft registered in the United States. Epskamp was a Dutch citizen who was arrested after boarding a N-tailed aircraft in the Dominican Republic, which was bound for Belgium, France with approximately 1,000 kilograms of cocaine. On appeal, Epskamp argued the district court lacked the power to exercise jurisdiction over his extraterritorial conduct, as a matter of both statutory and constitutional law. In part, Epskamp argued he had no knowledge that the aircraft was registered in the United States, which provided the extraterritorial jurisdiction.

The *Epskamp* court held that the offense of possessing with intent to distribute a controlled

---

5  The extraterritorial jurisdiction based on a United States citizen (Castillo) being on board the aircraft applies to both Counts 1 and 2.

substance on board an aircraft registered in the United States does not require a defendant's knowledge that the aircraft upon which the defendant is committing unlawful acts is registered in the United States or owned by a United States citizen. *Id.* at 166-67. Defendant's conviction for possession with intent to distribute a controlled substance on board an aircraft registered in the United States based, on extraterritorial application of the statute, did not violate the due process principle of fair warning, even if defendant did not know of the aircraft's registration in the United States; defendant's behavior was self-evidently criminal, so he had every reason to anticipate prosecution for his conduct. *Id.* at 169. Fair warning, as due process requirement, does not require that the defendants understand that they could be subject to criminal prosecution in the United States, so long as they would reasonably understand that their conduct was criminal and would subject them to prosecution somewhere. *Id.*

Escobar Tito's argument that extraterritorial jurisdiction under 21 U.S.C §§ 959(c)(1) and 959(d) would only apply to United States citizen Castillo fails to address the charges in Count 1 for Conspiracy (21 U.S.C. § 963) and in Count 2 for Aiding and Abetting (18 U.S.C. § 2). Extraterritorial jurisdiction applies equally to these statutes as well; to do otherwise would render the statutes superfluous, void, and insignificant.

In *United States v. Ballestos,* 795 F.3d 138, 144 (D.C. Cir. 2015), the D.C. circuit held that when a substantive offense is covered by an express extraterritoriality provision, the charge of conspiracy to commit the offense has the same extraterritorial reach. Following, in *United States v. Knowles,* 197 F. Supp. 3d 143, 150 (D.D.C. 2016), the court held it had "extraterritorial jurisdiction over the prosecution of these defendants for conspiring to distribute a controlled substance on board an aircraft registered in the United States in violation of 21 U.S.C. §§…963."

## CONCLUSION

The Government respectfully requests that defendant, Escobar Tito's motion to dismiss be denied, as the Indictment provides sufficient notice of the charges against him and extraterritorial jurisdiction is satisfied.

Respectfully submitted,

HAYDEN O'BYRNE
UNITED STATES ATTORNEY

/s/ James M. Ustynoski
James M. Ustynoski
Assistant United States Attorney
Court ID No. A5502615
500 E. Broward Blvd., Suite 700
Ft. Lauderdale, Florida 33394
(954) 660-5697 (telephone)
James.Ustynoski@usdoj.gov

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the July 15, 2025, the undersigned electronically filed the foregoing document with the Clerk of the Court using CM/ECF.

/s/ James M. Ustynoski
JAMES M. USTYNOSKI
Assistant United States Attorney